IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GENA P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:22CV256 |
| | ) |
| MARTIN J. O'MALLEY,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Gena P. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The Parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on June 28, 2017, alleging a disability onset date of January 1, 2006 in both applications. (Tr. at 13, 208-20.)[2] Her applications were denied initially (Tr. at 58-85, 126-30) and upon reconsideration (Tr. at 86-

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #10].

125, 133-41). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at. 144-45.) On May 15, 2019, Plaintiff, along with her attorney, attended the subsequent video hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 13.) Following this hearing, on August 1, 2019, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 29), and on June 24, 2020, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 5-9). Plaintiff did not file an action in this Court for nearly two years following the Appeals Council's decision. However, on March 7, 2022, the Council granted her request for additional time to file a civil action (Tr. at 1). Accordingly, Plaintiff's Complaint [Doc. #2] was timely filed.

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993)

(internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 *et seq.*, provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 16.) However, in assessing Plaintiff's claims, the ALJ further noted that there were two separate relevant periods at issue in this case. First, with respect to Plaintiff's claim for Disability Insurance Benefits under Title II, the ALJ noted that Plaintiff had "sufficient quarters of coverage to remain insured through December 31, 2010. Thus, [Plaintiff] must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits." (Tr. at 14.) Thus, the

---

sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

relevant period for Plaintiff's Title II claim is her alleged onset date of January 2, 2006 through December 31, 2010, her Date Last Insured. Second, with respect to Plaintiff's claim for SSI under Title XVI, the ALJ noted that the relevant period was her Application Date of June 28, 2017, through the date of the decision on August 1, 2019. (Tr. at 14, 16.) Therefore, at step two of the sequential evaluation process, the ALJ determined that Plaintiff suffered from a single severe impairment, lumbar degenerative disc disease, between her alleged onset date, January 1, 2006, and her date last insured, December 31, 2010. (Tr. at 16.) The ALJ further found that, from her application date, June 28, 2017, through the date of the decision, Plaintiff had the following severe impairments:

> lumbar degenerative disc disease, polycythemia vera, diabetes mellitus type II, hypertension, and chronic narcotic usage[.]

(Tr. at 16.) The ALJ determined at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 17-18.) She therefore assessed Plaintiff's RFC and determined that Plaintiff could perform light work with the following, non-exertional limitations:

> [Plaintiff] could lift-carry twenty pounds occasionally and ten pounds frequently. She could sit eight of eight hours, four hours at a time; she could stand/walk six of eight hours, three hours at a time. [Plaintiff] could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. She should avoid work on ladders/scaffolds and work at unprotected heights. [Plaintiff] could occasionally work with moving mechanical parts and operate a motor vehicle.

(Tr. at 18.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff's past relevant work as a sewing machine operator, as generally performed, did not exceed her RFC. (Tr. at 27.) The ALJ also found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the

6

vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 27-29.) The ALJ therefore concluded that Plaintiff was not disabled under the Act. (Tr. at 29.)

Plaintiff now contends that the ALJ failed to account for time off task and absences Plaintiff would incur "due to her significant fatigue from polycythemia vera, a form of chronic leukemia." (Pl.'s Br. [Doc. #16] at 1.) In raising this challenge, Plaintiff argues that "[t]here are several problems with the ALJ's treatment of [Plaintiff's] fatigue." (Pl.'s Br. at 5.) First, she asserts that the ALJ erred by relying on the opinions of the medical expert, Dr. Eric Puestow, rather than the statements of Plaintiff's treating hematologist oncologist, Dr. Dmitry Berenzon. (Pl.'s Br. at 5-7.) Second, Plaintiff contends that "the ALJ did not adequately consider how, regardless of the positive effects of [Plaintiff's] Pegasys interferon infusions (chemotherapy) on her platelet and hematocrit levels, fatigue is also a side effect of this medication used to treat her polycythemia vera." (Pl.'s Br. at 7.) Third, Plaintiff argues that her other impairments, including cardiomyopathy, "further complicat[ed] her fatigue." (Pl.'s Br. at 9.) After a thorough review of the record in this case, the Court finds that none of Plaintiff's contentions merit remand.

Turning first to the treatment of the opinion evidence, Plaintiff contends that the ALJ erred by relying on the opinion of Dr. Puestow, who is Board Certified in internal medicine and endocrinology, rather than the statements of Dr. Berenzon, who is Plaintiff's treating hematologist oncologist, and therefore has greater familiarity with both polycythemia vera generally and its effects on Plaintiff. (Pl.'s Br. at 5-7.) With respect to Dr. Puestow, the ALJ's

7

decision reflects that after the hearing, the ALJ referred all of the record evidence to Dr. Puestow for his medical opinion. (Tr. at 13.) As summarized by the ALJ:

> As mentioned above, the [ALJ] requested review of the file evidence by a medical expert. On June 8, 2019, Dr. Puestow, M.D., medical expert, analyzed the record evidence (Ex. 30F). Dr. Puestow stated, "Major problems are Polycythemia vera and cardiomyopathy. These are well controlled. Fatigue is not explained. I see no objective bases for the use of narcotics" (Ex. 30F/7). Dr. Puestow, M.D., completed a Medical Statement of Ability to Do Work-Related Activities (Physical) for both the Title II and Title XVI applications. Dr. Puestow rendered identical opinions for both applications. The claimant could perform a range of light work: she could sit eight of eight hours, four hours at a time and stand/walk six of eight hours in combination, three hours at a time. The claimant could occasionally climb stairs/ramps, and occasionally perform posturals; she should not climb ladders/scaffolds nor work at unprotected heights; she could occasionally work with moving mechanical parts and operate a motor vehicle (Ex. 30F). This considers the claimant's severe and nonsevere impairments alone and in combination, which would not require further work limitation.
>
> Dr. Puestow's opinion is consistent with a longitudinal review of the objective record and the overall evidence. He is Board Certified in Internal Medicine and Endocrinology and is a medical expert recognized by the Commissioner of Social Security. Dr. Puestow's opinion is persuasive and is adopted in the residual functional capacity.

(Tr. at 26-27) (internal brackets omitted). Plaintiff argues that Dr. Berenzon "is significantly more qualified than Dr. Puestow to comment on the symptoms and side effects from infusion therapies for [Plaintiff's] polycythemia vera." (Pl.'s Br. at 7.) She further asserts that, "[a]t the very least, the ALJ needed to discuss Dr. Berenzon's statements regarding the consistency between [Plaintiff's] repeated reports of fatigue and her diagnosis and treatment for polycythemia vera when assessing the supportability of [Plaintiff's] testimony – but she did not." (Pl.'s Br. at 7.)

However, the ALJ did include a review and assessment of Dr. Berenzon's treatment records, so this is not a case where the ALJ failed to consider or address a treating physician's

8

records. (Tr. at 18, 20, 21, 22, 23, 26.) Moreover, as Defendant correctly notes, the treatment records cited by Plaintiff actually reflect that Dr. Berenzon routinely assigned Plaintiff an "ECOG Performance Status" of 1. (Def.'s Br. [Doc. #20] at 15.)[5] These treatment records by Dr. Berenzon reflect his assessment that Plaintiff remained "ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work" under the ECOG criteria (Tr. at 1076, 1128, 1145, 1179, 1498, 1511, 1530, 1539, 1552, 1565, 1579, 1589, 1602), which is consistent with Dr. Puestow's opinion that Plaintiff could perform a range of light work, and directly undercuts Plaintiff's claim that the ALJ committed reversible error based on Dr. Berenzon's treatment records.[6]

Moreover, the statements relied upon by Plaintiff only state that "fatigue is a common symptom of polycythemia vera." (Pl.'s Br. at 5-6) (citing Tr. at 1485 ("Fatigue is a common presenting symptom in patients with myeloproliferative neoplasms secondary to increased

---

[5] In this regard, the ECOG Performance Status Scale is an assessment tool of the Eastern Cooperative Oncology Group that "describes a patient's level of functioning in terms of their ability to care for themselves, daily activity, and physical ability (walking, working, etc.)" in order to provide hospitals and cancer centers a "standard criteria for measuring how the disease impacts a patient's daily living abilities." See ECOG Performance Status Scale, ECOG-ACRIN Cancer Research Group, https://ecog-acrin.org/resources/ecog-performance-status/. The ECOG Performance Scale uses the following values:

| | |
|---|---|
| 0 | Fully active, able to carry on all pre-disease performance without restriction |
| 1 | Restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work |
| 2 | Ambulatory and capable of all selfcare but unable to carry out any work activities; up and about more than 50% of waking hours |
| 3 | Capable of only limited selfcare; confined to bed or chair more than 50% of waking hours |
| 4 | Completely disabled; cannot carry on any selfcare; totally confined to bed or chair |

[6] Plaintiff's other oncologist, Dr. Magrinat, similarly evaluated Plaintiff with an ECOG Performance Status of 1. (Tr. at 589.) Plaintiff does not point to any contrary conclusions.

9

levels of poor inflammation site."); Tr. at 1503 ("Fatigue is a common present symptom in patients with myeloproliferative neoplasms secondary to increased levels of proinflammatory cytokines.")). These statements do not indicate, as Plaintiff suggests, that Plaintiff's own fatigue limited her functioning to an extent inconsistent with Dr. Puestow's opinion or the RFC assessment, particularly in light of Dr. Berenzon's reports that Plaintiff remained capable of a Level 1 ECOG Performance Status.

In her related second argument, Plaintiff contends that the ALJ did not adequately consider the side effects of Plaintiff's interferon infusions, which include fatigue. (Pl.'s Br. at 7-8) (citing Benfield v. Saul, 827 F. App'x 297, 300-01 (4th Cir. Sept. 24, 2020); 20 C.F.R. § 404.1529(c)(3) (explaining that because side effects of medication can impair an individual's ability to function just as the medical conditions themselves, ALJs are required to consider their effects when crafting the RFC)). Here again, Plaintiff relies on the statements of Dr. Berenzon, who stated in June 2016 that "systematic symptoms are fairly common in patients with polycythemia vera, and I suspect that interferon might contribute to [Plaintiff's] fatigue and night sweats. Because of this, I decided not to increase the dose of Pegasys at this point but monitor her." (Pl.'s Br. at 6) (quoting Tr. at 1607). As recounted by the ALJ, subsequent treatment notes show that Plaintiff's hematocrit and platelet levels improved significantly with treatment, and Dr. Berenzon reduced Plaintiff's Pegasys dosage. (Tr. at 20-23.) Notably, Plaintiff's hematology oncology treatment notes reflect that, in March 2017, Plaintiff was placed in the "non acute pool" of patients after she cancelled all appointments from October 2016 forward and indicated that she did not plan on scheduling an appointment until she ran out of medication. (Tr. at 1285.) One of Dr. Berenzon's collegues, Dr. Rupali Bhave, noted

that Plaintiff's blood counts were stable as of March 2017, and noted that Dr. Berenzon had prescribed 3-months-worth of Pegasys in November 2016 with 3 refills. (Tr. at 1285.) These records indicate that he reduced Plaintiff's dosage by phone in August 2018, and subsequent lab reports were reviewed and were "basically normal." (Tr. at 1296, 1314.) This effective, conservative, and remotely-monitored treatment history does not reflect any relevant side-effects from Plaintiff's interferon therapy, let alone side effects that would undermine the ALJ's analysis of Plaintiff's functioning.

Further, as reflected in both the administrative decision and Plaintiff's own brief, Plaintiff's fatigue contentions largely rely on evidence from 2012 through mid-2017. (See Pl.'s Br. at 8-10); (Tr. at 20-21, 22, 23.) As set out above and emphasized in the ALJ's decision, three distinct time periods are involved in this case. The first, spanning from Plaintiff's 2006 alleged onset date to her date last insured of December 31, 2010, predates her diagnosis of polycythemia vera by nearly three years, and therefore is inapposite to her arguments regarding fatigue from that condition. (Tr. at 18, 23.) The second period, from Plaintiff's December 31, 2010 date last insured for DIB to her application for SSI on June 28, 2017, is not directly at issue, except as evidence may relate to Plaintiff's condition after that time. Only Plaintiff's abilities during the third time period, from her June 28, 2017 application date to the ALJ's decision date of August 1, 2019, are directly relevant in this case. Accordingly, the documented stabilization and improvement of Plaintiff's condition prior to her SSI application date undermines Plaintiff's arguments regarding fatigue from both polycythemia vera and its treatment. (See Tr. at 20-21, 22, 23.)

To the extent that Plaintiff's contention relies on her own testimony and fatigue complaints to her providers, the Court again finds no error in the ALJ's analysis. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. In Arakas v. Commissioner, Social Security Administration, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4-5. SSR 16-3p recognizes that "symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95 (internal brackets omitted). Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects

12

her ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529:

> (i) [Plaintiff's] daily activities;
> (ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
> (v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
> (vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, as instructed by the regulations, the ALJ considered the entire case record and explained the reasons for deviating from Plaintiff's statements regarding the impact of her symptoms on his ability to work. Whether the ALJ could have reached a different conclusion based on the evidence is irrelevant. The sole issue before the Court is whether substantial evidence supports the ALJ's decision. See Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972) ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" (internal footnote omitted)).

Here, the ALJ's decision reflects that she (1) thoroughly reviewed the medical evidence, the opinion evidence, and Plaintiff's testimony and (2) sufficiently explained her analysis of

13

Plaintiff's subjective complaints. Significantly, during the hearing, Plaintiff extensively described her fatigue and the limitations it caused in response to questions from both the ALJ and Plaintiff's counsel. The ALJ recounted this testimony in her decision, including Plaintiff's reports that she spends "fourteen to fifteen hours" per day in bed and receives help from her mother with household chores and childcare for her 2-year-old daughter. (Tr. at 19.) However, the ALJ also relied upon Plaintiff contemporaneous reports of her daily activities, which reflected that, from her application date forward, Plaintiff was able to prepare simple meals, drive, shop, attend church, perform weekly chores, and care for both her daughter and her dog. (See Tr. at 19, 24.) Specifically, the ALJ explained that:

> In terms of daily activities, the claimant testified to rather limited functioning, stating some days she did not get out of bed, and was home every day. Other information included rather normal functioning. The claimant reported in July 2017, she took care of her baby, prepared meals daily (usually frozen dinners), did laundry once a week, drove, shopped for groceries once a week for thirty minutes, talked on the phone, and went to church sometimes (Ex. 3E). In April 2018, the claimant reported she took care of her baby and her mini-dachshund, prepared simple meals daily, put clothes in the washer and dryer once a week, drove, and went to the grocery store once a week for an hour (Ex. 6E). The claimant declined dietary changes in October 2017, as the next week they were going on vacation (Ex. 9F/82). The claimant testified she cared for her daughter, age 2, attended church weekly, watched TV, used social media, and read to her daughter. The claimant appears to be a full time homemaker of a toddler.

(Tr. at 24.) The ALJ concluded that these "[r]eported activities are not inconsistent with a range of light work." (Tr. at 24.) In making this finding, the ALJ also relied in large part upon Dr. Puestow's medical evaluation, which, as set out above, was consistent with the ECOG performance status consistently assigned by Dr. Berenzon. (See Tr. at 26-27, 1145, 1179, 1498, 1530, 1539, 1552, 1565, 1579, 1589, 1602, 1782-99.)

14

As the ALJ also stressed throughout her decision, Plaintiff lived a "very sedentary lifestyle, due to fear of her condition," rather than due to limitations from her impairments. (Tr. at 24, 1023, 1755.) These impairments included peripartum cardiomyopathy and lumbar degenerative disc disease as well as polycythemia vera. (Tr. at 16.) Although Plaintiff suggests, in her third argument, that her additional impairments "further complicat[ed] her fatigue" (Pl.'s Br. at 9), she again points to no evidence supportive of specific, fatigue-based limitations such as time off task or absenteeism. Notably, a "cardiopulmonary exercise test on May 3, 2018 indicated no functional impairment and no apparent signs of circulatory, pulmonary, or mixed limitation to exercise." (Tr. at 22) (citing Tr. at 986-87, 989). On that date, Plaintiff "reported that she lived a sedentary life and that [the exercise test] was the most exercise she had done in quite some time." (Tr. at 22, 1023.) As noted by the ALJ, these records note that "her fatigue was out of proportion" to what was reflected in the cardiac tests. (Tr. at 22.) In fact, Plaintiff's providers regularly noted that some of her fatigue was due to deconditioning and encouraged her to <u>increase</u> her physical activity and make dietary changes to better manage her conditions, and "stay active and get more exercise." (See Tr. at 21, 22; Tr. at 408 (encouraging Plaintiff to "increase exercise"); Tr. at 650-51 (Plaintiff encouraged to start walking as some of her fatigue was due to deconditioning, and Plaintiff "was not that interested in making changes, despite her anxiety regarding [her] diagnoses"); Tr. at 652 (Plaintiff had increased fasting blood sugar levels and reported being fatigued and "quite sedentary," but had "not made any changes to her diet"); Tr. at 661 ("I encouraged her to start walking as I am sure some of her fatigue is deconditioning."); Tr. at 675-76, 810, 860-62 (advising on diet changes and to "walk for exercise"); Tr at 703-04, 715 (recommending increasing exercise);

Tr. at 1025 (Plaintiff encouraged "to increase physical activity with daily walking")). However, Plaintiff declined to make recommended changes to improve her fatigue. (Tr. at 21.)[7]

Ultimately, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." (Tr. at 22.) The ALJ then concluded that:

> Nothing in the claimant's clinical signs suggest that the residual function capacity assessment is unreasonable. Nor does the record reflect a treatment regimen inconsistent with such limitations. In sum, the above residual functional capacity assessment is supported by the medical evidence of record, ongoing conservative care, the opinion of State agency medical consultant, Dr. Clayton, M.D., the opinions of State agency psychological consultants, the opinion of medical expert Dr. Puestow, M.D., reported activities, and inconsistencies in the claimant's statements with the record evidence.

(Tr. at 27.) Plaintiff presents no valid basis to disturb the ALJ's RFC assessment.[8] As set out in the administrative decision and outlined above, substantial evidence supports the ALJ's findings regarding Plaintiff's fatigue, and the path of the ALJ's reasoning is easily traceable. To the extent that Plaintiff essentially asks the Court to reconsider and re-weigh the evidence presented, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here

---

[7] As noted by the ALJ, Dr. Puestow noted that Plaintiff's peripartum cardiomyopathy resolved after the postpartum period. (Tr. at 16, 1783). To the extent Plaintiff attributed her fatigue to depression, the ALJ considered that testimony (Tr. at 19), but concluded that her depression did not cause "more than minimal limitations" and was nonsevere. (Tr. at 16-17.) In addition, the ALJ noted that her hypertension and diabetes were well controlled with medications. (Tr. at 18, 23, 24.)

[8] The Court also notes that the ALJ specifically considered the hypothetical question posed to the Vocational Expert regarding the effect of being off task 25% of the day and being absent three or four days per month, but concluded that, for the reasons previously stated, "the overall record evidence did not support [Plaintiff's] allegations, and this further hypothetical has been rejected." (Tr. at 28.) Thus, the ALJ specifically considered Plaintiff's contentions but concluded that she was not as limited as alleged.

conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained her decision, and clearly explained the reasons for her determination. That determination is supported by substantial evidence in the record. Plaintiff has not identified any errors that require remand, and Plaintiff's Motion to Reverse the Decision of the Commissioner should therefore be denied.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #16] is DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #19] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 25th day of March, 2024.

/s/ Joi Elizabeth Peake
United States Magistrate Judge